# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00108-CR

**Verten Dodson, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. D-1-DC-07-300805, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Verten Dodson guilty of murder. *See* Tex. Penal Code Ann. § 19.02(b) (West 2003). The district court sentenced Dodson to thirty years' imprisonment. On appeal, Dodson argues that the evidence is factually insufficient to sustain the jury's verdict in the face of evidence presented by Dodson that he acted in self-defense. *See id.* § 9.32 (West Supp. 2008). We affirm the judgment of conviction.

## BACKGROUND

Around noon on April 7, 2007, Dodson, his friend Raul Olalde, and Betty Olalde—Raul's mother and Dodson's girlfriend—were driving through a residential neighborhood in north Austin. As they approached the intersection of Hunter's Chase and Colony Creek, Dodson shot Raul Olalde in the back. After the shooting, Betty Olalde stopped the car in the middle of the

road.   According to eye witnesses in an oncoming car, Raul exited the front passenger seat and walked over to the sidewalk before collapsing on the ground.  Betty then stepped out of the driver's seat, screaming and hysterical.  A few seconds later, Dodson climbed out of the back seat, walked calmly away from the car, glanced back at Raul, slipped through a gap in the fence, and walked away along a creek bed.  A man who came upon the scene shortly thereafter administered CPR to Raul and emergency personnel were called.  Raul was taken to a local hospital, where he was pronounced dead on arrival.

The events immediately prior to the shooting are largely disputed.  Betty Olalde testified that as they were driving, Raul asked Dodson if there was any crack in the car for Raul to smoke.  Dodson indicated that there was a rock of crack in the console between the front seats.  According to Betty, Raul then looked for a soda can he could use to smoke the crack and as he lit it and began to smoke, Dodson shot Raul.[1]

Dodson disputed Betty's version of these events.  Dodson testified that, as Raul got in the car shortly before noon on April 7, he was acting "kind of jerky" and seemed angry.  According to Dodson, Raul began digging around in the car and then made a sudden move towards his lap, which Dodson interpreted to be reaching for a gun.  Dodson knew Raul owned a gun, because Dodson himself had stolen the gun from a vehicle a few days before the shooting.  Dodson at first testified that he gave Raul the gun, and then later said that Raul "just snatched it" from him.

---

[1] The crime scene photographs of the car show a soda can on the floorboard and a lighter sitting on the dashboard.  Betty testified that she thought the lighter on the dashboard was hers and that Raul had his own lighter. However, the police investigators who searched the car did not find a second lighter nor did they seize crack cocaine or any other drug during the car's inventory.

2

According to Dodson, Raul always carried his gun in either the pocket of his cargo shorts or in his waistband. Because Raul was not wearing cargo shorts that day, Dodson said he believed Raul's gun was at his waist, and thought Raul was reaching for it in order to shoot Dodson. Dodson admitted that there was a possibility that Raul carried a cell phone at his waist, but maintained that he was certain that Raul was reaching for a gun when Dodson shot him. Dodson claims he then shot Raul in self-defense. After the shooting, police found Raul's gun zippered shut inside a backpack, which, according to Betty, Raul had been holding in his lap. Dodson testified, however, that he was not aware of this fact and sincerely and reasonably believed the gun was at Raul's waist.

Dodson explained his purported belief that Raul was reaching for his gun in order to kill Dodson by pointing to events in the weeks leading up to the shooting. Dodson testified that his relationship with Raul had become strained because Raul was upset about Dodson dating his mother Betty and was frustrated that Betty seemed to choose Dodson over Raul. Raul's wife, Lydia Olalde, also testified to Raul's concern that his mother chose Dodson over him. Dodson testified that Raul claimed to have taken a life insurance policy out on Dodson and to have opened a bank account in Dodson's name. Dodson testified that he thought someone who took out a life insurance policy was "waiting for you to die so they can get some money." Betty and Lydia shared the belief that Raul had taken out a life insurance policy on Dodson, though they each heard this through Dodson, not Raul. Betty testified that Dodson told her about this policy, and Lydia testified that she learned of it from Betty after Raul's death. Dodson also claimed to have been told by Betty that Raul had threatened to kill Dodson about a week before the shooting.

3

Dodson testified that he was afraid Raul's anger and frustration would lead to violence because Raul had a violent track record with his family and friends. According to Dodson, Raul had tried to rape his younger sister, Vanessa Olalde, and had hit and bruised Betty when she tried to stop him. Dodson claimed that on a different occasion Raul had used his fingers to sexually penetrate Vanessa, that he regularly sent her to beat up women who owed him money for drugs, and that he had once slapped her across the face, causing her to bleed. Dodson also testified that he had seen Raul chase a friend with a knife.

Lydia Olalde confirmed the tension between Raul and Dodson. Her characterization of it, however, was significantly different. According to Lydia, Dodson blamed Raul for a prior arrest and conviction for a theft the two men committed together. Dodson believed that Raul had told the police about Dodson's involvement in that theft and suspected Raul of speaking to the police about their more recent car burglaries in an attempt to send Dodson back to jail.[2]

On April 6, 2007, the night before the shooting, the tension between Dodson and Raul appeared to be coming to a head. Dodson testified that he and Raul borrowed Betty's car and drove around together, burglarizing cars and smoking crack—and arguing much of the time. According to Betty, who joined them early the next morning as they drove around north Austin, at one point Dodson accused Raul of being greedy and then threatened Raul with a gun. Betty testified that

_____

[2] The notes taken by the police detective who interviewed Lydia said that Lydia told the detective that Raul suspected Dodson of trying to send Raul to jail, rather than the other way around. Lydia maintained that the police detective had gotten that statement backwards. When first asked about this possibility, the detective testified that she didn't believe she had made a mistake. But on cross examination, after reading the note in the context of the previous sentence, which stated that Dodson had pulled a gun on Raul, the detective changed her mind and testified that she had probably inadvertently switched the names in her notes.

4

Raul's reaction to Dodson's threat was to exit the car and walk off by himself. Dodson acknowledged that he and Raul had argued and that Raul had walked away from the car, but testified that he did not recall threatening Raul.

After Raul walked away, he went to the hotel where his wife Lydia and his children were staying. While there, Raul spoke with Lydia about his conflict-filled relationships with Dodson, his mother, and Lydia. According to Lydia, Raul told her that Dodson had pulled a gun on him and accused him of trying to send Dodson back to jail. Lydia testified that Raul was upset that his mother had watched this happen and had done nothing to intervene on Raul's behalf. As they spoke about their own troubled relationship, Raul told Lydia that if he could just shoot himself and her, then all of their troubles would go away. Lydia testified that this statement did not frighten her; she simply took it as evidence that Raul was feeling sad.

While Raul was at the hotel with Lydia and the children, Betty and Dodson drove to Pflugerville to Dodson's sister's house so that Dodson could pick up his social security card and identification card. According to Dodson, he needed those items to look into the bank account that Raul allegedly opened in Dodson's name. As Dodson and Betty were driving back to north Austin,[3] Betty received a call from Raul, who asked her to bring some clothes to his hotel room. Betty testified that Raul was still angry with Dodson and asked her to not bring Dodson; however, she and Dodson went to the hotel together anyway.

---

[3] Dodson testified that he and Betty were driving to a bank to check on the supposed bank account that Raul had opened. Betty testified that Dodson had wanted to go by the bank to check on the supposed life insurance policy, but that she had refused, and that they were not headed to any specific place when Raul called.

When they arrived at the hotel, Betty went inside to give Raul his clothes. Betty testified that Raul then asked her to give him a ride. When Betty returned to the car, she told Dodson that Raul was coming with them. She asked Dodson if he wanted to continue to drive or if he wanted her to drive. Dodson told her to drive. Raul then came out to the car, carrying his daughter's backpack with his gun inside.[4] Dodson moved to the back seat and told Raul to sit in the front passenger seat.

They had only driven a few miles when Dodson shot Raul. When police first arrived on the scene and questioned Betty, she told them that she did not know the person who had shot her son. She said they had picked up an unknown hitchhiker who had then shot her son and walked away. She also told the police she was unable to describe the hitchhiker or even tell them his race. After the police found Dodson's identification card on her, Betty admitted that he had been the shooter. Betty testified at trial that she had been protecting Dodson because she loved him and did not want to be alone.

Dodson was arrested on April 9, 2007. The booking officer testified that Dodson told him that "he didn't understand why he was in jail, he did a good thing taking him out. He told me that someone was selling a lot of drugs, kidnapping kids, and he did it and he'll take it." The officer further testified that Dodson said he was "the only one who could get close enough" and that Dodson did not make any statements indicating he was afraid of Raul or had shot Raul in order to protect himself or anyone else.

---

[4] Betty testified at trial that she did not know Raul had his gun with him. This testimony contradicted her testimony before the grand jury. Defense counsel drew this contradiction to the jury's attention. Once Betty finished testifying about this issue before the trial court, she was arrested, outside the presence of the jury, on suspicion of perjury.

6

The jury found Dodson guilty of murder. *See* Tex. Penal Code Ann. § 19.02(b). The trial court sentenced him to thirty years' imprisonment.

## STANDARD OF REVIEW

Evidence is factually insufficient when it is so weak that the verdict seems clearly wrong and manifestly unjust, or when the verdict is against the great weight and preponderance of the evidence. *Berry v. State*, 233 S.W.3d 847, 854 (Tex. Crim. App. 2007); *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). In reviewing for factual sufficiency, we consider all the evidence in a neutral light, while giving due deference to the jury's determination. *Sims v. State*, 99 S.W.3d 600, 604 (Tex. Crim. App. 2003) (reviewing court must consider all evidence, including that which is most important to appellant's claim); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002) (reviewing court must view evidence in neutral light and be appropriately deferential to jury). The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Vasquez*, 67 S.W.3d at 236. We may not reweigh the evidence and substitute our judgment for that of the jury. *Watson*, 204 S.W.3d at 417; *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

## DISCUSSION

In his sole point of error, Dodson argues that the evidence was insufficient to prove beyond a reasonable doubt that he did not act in self-defense. At trial, Dodson sought to show that he was justified in using deadly force because he reasonably believed that deadly force was

7

necessary to protect himself against attempted unlawful deadly force by Raul. *See* Tex. Penal Code Ann. § 9.32.[5]

The issue of self-defense is a fact issue to be determined by the jury. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). A defendant raising the issue of self-defense has the burden of producing evidence to support that defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The State then has the burden of persuasion to rebut the defense; however, the State does not have a burden of production of evidence. *Id.* When a jury returns a guilty verdict, it implicitly rejects the defendant's theory of self-defense. *Id.*

When a defendant challenges the factual sufficiency of the rejection of a defense, the reviewing court applies the ordinary factual-sufficiency standard. *Id.* First, we review all of the evidence in a neutral light and ask whether the State's evidence of guilt is so weak as to make the guilty verdict clearly wrong or manifestly unjust. *Id.* Then, we weigh the State's evidence against

---

[5] Under the penal code, "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a) (West Supp. 2008). Deadly force is justified only if the actor reasonably believes the deadly force is immediately necessary "to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a)(2)(A) (West Supp. 2008).

In determining whether the actor reasonably believed that deadly force was necessary, the jury may consider whether the actor failed to retreat unless the actor "has a right to be present at the location," did not provoke the victim, and was not engaged in criminal activity at the time the deadly force was used. *Id.* § 9.32(c),(d).

Force is not justified "in response to verbal provocation alone" nor is it justified "if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person" while the actor was unlawfully carrying a handgun. *Id.* § 9.31(b)(1), (b)(5)(A), § 46.02 (West Supp. 2008).

the evidence presented by the defense and ask whether the verdict of guilty is against the great weight and preponderance of the evidence. *Id.*

There was no dispute that Dodson shot Raul. The State presented testimony by Betty Olalde that when Dodson shot Raul, Raul was in the process of smoking crack. Betty testified that Raul and Dodson were not arguing and that Raul made no threats to Dodson. The State also presented evidence that Dodson was angry with Raul, had threatened him in the past, and accompanied Betty to the hotel to meet Raul, even though he knew Raul did not want him to come. The fact that Raul was shot in the back and the testimony by impartial eye witnesses that Dodson exited the vehicle from the rear seat and then walked calmly away from the scene just moments after having shot Raul provide additional support for a murder conviction. Thus, the State's evidence of guilt is not so weak as to make the guilty verdict clearly wrong or manifestly unjust.

Neither is the verdict against the great weight and preponderance of the evidence. While Dodson's testimony raised the possibility of self-defense, his version of events was contradicted by Betty Olalde's testimony. Dodson testified that he shot Raul after Raul reached for his lap, whereas Betty testified that Raul was in the process of smoking crack cocaine and had just lit the soda can he held in one hand with the lighter he held in the other hand. The police did not find any crack cocaine in the car when they searched the car. When Raul exited the car, however, the backpack he had been holding fell to the ground (and was later picked up by Betty and thrown into the backseat of the car), and the jury could have reasonably concluded that the rock of crack cocaine fell to the ground, as well, and was never noticed by the police. In addition, the toxicology report on Raul revealed that he had cocaine in his blood stream, which indicates cocaine use during the last one or two days of his life.

9

Further, Dodson's testimony that Raul had threatened him in the past and was angry with Dodson was countered by the testimony of Betty and Lydia Olalde that it was in fact Dodson who was angry with Raul and had threatened him. Finally, the booking officer's testimony that Dodson had told him that "he did a good thing taking [Raul] out," and that Dodson did not tell the booking officer that Raul was reaching for his gun or that he was afraid of Raul, also undermines Dodson's self-defense argument.

In the end, this case comes down to conflicting witness testimony, and it is for the factfinder—the jury in this case—to resolve conflicts in evidence. *Vasquez*, 67 S.W.3d at 237. Dodson argues that Betty Olalde was not a credible witness and cites to the fact that she was arrested for perjury because parts of her testimony before the trial court contradicted her testimony before the grand jury. However, the jury, as the trier of fact, is the sole judge of the credibility of a witness's testimony and may believe or disbelieve any part of a witness's testimony. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Saxton*, 804 S.W.2d at 914 (Tex. Crim. App. 1991). The jury was presented with Betty's conflicting grand jury testimony about whether she knew that Raul had a gun when he got in the car. The jury was then free to assess her credibility and judge for itself whether to believe her version of the events or Dodson's.[6] Based on the evidence presented, the jury found Dodson's theory of self-defense unpersuasive.[7]

---

[6] The jury was also presented with impeachment evidence against Dodson. Dodson admitted to seventeen prior misdemeanor convictions and four prior felonies, including burglary of a habitation with intent to commit assault. Dodson also admitted to being a regular user of crack cocaine, to burglarizing cars and selling crack to support his habit, to smoking crack in the hours just before the shooting took place, and to having impaired judgment when high.

[7] The jury may have found Dodson's theory unpersuasive because they did not believe his version of the events, and instead believed Betty. Alternatively, the jury may have believed Dodson, but found that Raul reaching for his lap would not have created a reasonable apprehension of deadly harm in a reasonable person in Dodson's position.

10

After reviewing all the evidence in a neutral light, we cannot say that the evidence is so weak as to make the jury's verdict clearly wrong or manifestly unjust, nor can we say that the jury's verdict is against the great weight and preponderance of the evidence. We overrule Dodson's point of error and affirm the judgment of conviction.

## CONCLUSION

Because the evidence was factually sufficient to support the jury's verdict, we affirm the judgment of conviction.

_____

Diane M. Henson, Justice

Before Justices Patterson, Waldrop and Henson

Affirmed

Filed:   November 7, 2008

Do Not Publish